appraised value of their capital stock,' etc.   Banks and savings institutions are expressly excepted from the provisions of the section, and, therefore, from the proviso which, as will be seen at a glance, is quite different from the conditional exemption clause of § 25.   This difference shows what language the legislature would have used in the latter section if they had intended what the plaintiff claims.

" For these reasons, we answer the third question in the negative, and judgment is directed to be entered for the plaintiff for $286."

*Error assigned* was the entry of judgment for plaintiff for $286, instead of $325.

*Lyman H. Bennett,* for appellant.

*William S. McLean,* for appellee.

PER CURIAM, April 25, 1892:

The opinion of the learned president of the court below is so clear and satisfactory that we adopt it as the opinion of this court.

Judgment affirmed.

# Commonwealth ex rel., Appellant, *v.* McGroarty.

[Marked to be reported.]

*Municipal law—Change of borough into a city—Act of May 23, 1889.*

The legislature having declared in the act of May 23, 1889, that, in changing a borough to a city, the borough charter shall remain in full force and operation, until the first Monday of April following the election of city officers, and that the city government shall not be organized until that time, has, by necessary implication, declared that the city charter shall meanwhile remain in abeyance.

*Liquor license fees.*

Therefore where a license was granted for the sale of liquor for one year from the first day of April, in a borough, the city charter of which would go into effect on the fourth of April; *held,* that the fee to be paid by the holder of the license was the fee of a borough, not of a city license.

Argued April 12, 1892.   Appeal, No. 418, Jan. T., 1892, by plaintiff, The Commonwealth of Pennsylvania ex rel. William Doolittle, from judgment of C. P. Luzerne Co., May T., 1892,

No. 45, for defendant, John S. McGroarty, treasurer of Luzerne Co., on case stated.   Before PAXSON, C. J., STERRETT, GREEN, McCOLLUM and MITCHELL, JJ.

Case stated in the nature of an alternative mandamus, to determine amount of liquor license fee.

The case stated was as follows:

" 1. That the petition hereto attached, to be considered for the purposes of this case as an alternative mandamus issued to the said John S. McGroarty, treasurer of Luzerne county, and that the facts set forth therein are true.

" 2. That the said William Doolittle filed his petition in the court of quarter sessions of this county for a retail liquor license in and for the East ward of the borough of Hazleton and which license was granted upon the 29th of February A. D. 1892.

" 3. That the said John S. McGroarty is treasurer of Luzerne county, Pennsylvania.

" 4. That at the date of filing said license petition and at the time of the granting of the same the said William Doolittle was a resident and citizen of a municipality known as the borough of Hazleton, Luzerne county, Pennsylvania, governed and regulated and incorporated under the general borough act of the 3d of April, 1851, entitled an ' Act Regulating Boroughs.'

" 5. That upon the 4th day of November, 1891, the legal voters of said borough, said borough having a population of ten thousand inhabitants, by a majority decided to become incorporated as a city of the 3d class.   That letters patent, creating such incorporation, were issued by the governor on the 10th day of December A. D. 1891, and recorded in corporation docket, recorder's office of said county, No. 3, page 200.

" 6. That the citizens and voters of said municipality elected city officers, including a city treasurer, at the election held therein on the third Tuesday of February, 1892, in the manner provided by law.

" 7. That the said city organization is to take effect on the first Monday of April, 1892, viz.: 4th April, 1892.

" 8. That the territory embraced in what was originally the borough of Hazleton is the same as is included within the corporate limits of the city of Hazleton.

" 9. That the licenses granted as aforesaid are to issue within 15 days from the 29th February, 1892, and to authorize the sale of liquor for one year from the first day of April, 1892.

" 10. That the license fee in boroughs is one hundred and fifty dollars, and in cities of the 3d class five hundred dollars. That a tender of said amount was made to the said treasurer and refused, he insisting that the said Wm. Doolittle should pay five hundred dollars.

" 11. That if the court shall be of the opinion that under the facts stated as aforesaid that the license fee to be paid by the said relator, Wm. Doolittle, is one hundred and fifty dollars, then judgment be entered upon this case stated in favor of the plaintiff. If, however, the court shall be of the opinion that under the facts stated as aforesaid that the license fee to be paid by the said relator, Wm. Doolittle, is five hundred dollars, then judgment be entered upon this case stated in favor of the defendant.

" 12. It is agreed that the sum of five hundred dollars be treated as paid into the court by the said Wm. Doolittle.

" 13. Either side in any event however to have the right to an appeal to the Supreme Court by certiorari or otherwise."

The petition attached was as follows:

" To the Honorable the Judges of the Court of Common Pleas in and for the County of Luzerne.

" Your petitioner respectfully represents, that on the 29th day of February, anno Domini one thousand eight hundred and ninety-two, your honorable court granted him a retail liquor license for the east ward of the borough of Hazleton, in the county of Luzerne, and in the state of Pennsylvania, which license under the law must be taken out and paid for within fifteen days from the date it was granted.

" That he has tendered to John S. McGroarty, county treasurer of Luzerne county, the sum of one hundred and fifty-two dollars, the amount of said license fee, and costs.

" That the said county treasurer refused to accept said tender or issue said retail liquor license for the amount tendered, but demanded the payment of five hundred dollars, on the ground that the borough of Hazleton is now a city of the third class.

" That said license was granted to him as a citizen of the borough of Hazleton ; that the borough charter of Hazleton by

COMMONWEALTH, Appellant, *v.* McGROARTY.     609

law remains in full force in said borough until the first Monday in April, anno Domini one thousand eight hundred and ninety-two ; that the settlement of the county treasurer will be made with the treasurer of the borough of Hazleton, who cannot lawfully demand more than three fifths of one hundred and fifty dollars, less commissions.

"He therefore prays this honorable court to issue a writ of mandamus directed to the said John S. McGroarty, treasurer of Luzerne county, to make out and deliver to your petitioner the retail liquor license, which has been granted to him by the court upon the payment of one hundred and fifty-two dollars, that being the regular and lawful fee and costs for a retail liquor license in the boroughs of this commonwealth."

The court below entered judgment in favor of the defendant in the following opinion by WOODWARD and LYNCH, JJ.

"Petition for a mandamus.

"The case stated agrees upon the facts.

"The question to be decided is whether the relator shall pay for a retail license $150 or $500.

"The correct determination of the question depends upon whether Hazleton was on the 10th day of December, 1891, a city of the third class under the provisions of the act of the 23d of May, 1889.   (P. L. 1889, p. 277.)

"By the 8th sec., act of 1887, all persons licensed to sell at retail any liquors are classified and required to pay annually for such privileges, as follows:   'Persons licensed to sell by retail, resident in cities of the first, second and third class, shall pay the sum of $500.'

"At the time the relator's petition was filed, it is agreed, he was a resident of the borough of Hazleton.   Under the provisions of the act of 1889, at a general election held in the borough of Hazleton, on the 4th day of November, 1891, a majority of the electors voted in favor of a city charter.   It appearing by the returns that there was a majority in favor of a city charter, the governor issued letters patent, under the great seal of the commonwealth, reciting the facts, defining the boundaries of the city, 'and constituting the same a body corporate and politic by the name of the city of Hazleton.'

"Was there any essential wanting or necessary to create the city of Hazleton ?

VOL. CXLVIII—39

" A city is 'a town incorporated by that name :' Bouv. L. Dict.

" In the case at bar there is,

" 1. A general law by which a general mode is pointed out for the erection and charter of cities of the third class in which individuals may associate themselves together and obtain authority to act as a corporation.

" 2. An election held in pursuance of law whereby a majority of the electors of the borough voted in favor of the change of government from a borough to a city ; and

" 3. Letters-patent issued by the governor ' constituting the same a body corporate and politic by the name of the city of Hazleton.'

" A charter is defined to be, ' A grant made by the sovereign either to the whole people or a portion of them, securing to them the enjoyment of certain rights.' It will hardly be contended that the act of 1889, the election held last November, and the letters-patent granted by the governor, do not constitute the charter of the city of Hazleton and make it a city of the third class.

" There is a distinction between the creations of a corporation and its organization, many powers, rights, and capacities, which are attached after its due incorporation.

" Art. 15, sec. 1, of the constitution of 1873, declares, ' cities may be chartered, whenever a majority of the electors of any town or borough, having a population of at least ten thousand, shall vote at any general election, in favor of the same,' and the title of the act of 1889 is, ' Providing for the incorporation and government of cities of the third class.' The first, second and third sections of the act under the head of ' Incorporation of cities of the third class,' show the plain distinction between the character of the government of the territory before and after the issuing of letters-patent.

" Were it necessary that the people of Hazleton should accept the charter authorized by the act of 1889, their vote at the general election of 1891 satisfies that requirement.

" The third section of the act provides that all the property of the borough which shall thus become a city is hereby vested in the corporation or body politic of said city, by the name, style and title given thereto. Now, if the city had not been in

existence by virtue of the process referred to, it is difficult to understand how, or why, the legislature should direct that the property of the borough vest in something that had not a legal being. There is nothing in the act of 1889, or in the letters-patent suspending or delaying the creation of the city or providing that it shall in any way depend upon the organization of the municipal government. Again, by virtue of article VI, sec. 2, of the act of 1889, an election for mayor and other city officers was held last February. A valid election of persons to fill offices in a city which had no existence in law would, to say the least, be a novelty.

" As an additional evidence of what would seem to have been the intention of the legislature in enacting this law, article XIX, section 1, provides, ' cities of the third class shall include only '

" ' First All cities of the proper population which have been *incorporated* under the provisions of an act of assembly entitled,' etc., (the act of May 23, 1874,) ' or which may be incorporated under the provisions of this act.' It is therefore, for the reason given, believed, that from the 10th day of December, 1891, Hazleton was and is a body politic and corporate—a city.

" In the case of Berlin v. Gorhom, 34 N. H. 266, it was provided by a statute, ' all persons, dwelling and having their homes in any unincorporated place at the time when the same shall be incorporated into a town, shall thereby gain a settlement therein.'

" It was objected that to make an incorporation of a town effectual, there must be a legal town meeting holden in it, and as the pauper, though he resided in the town at the passage of the act, removed before any meeting was holden he did not gain a settlement.

" It was said by the court, ' This objection rests upon the rule which applies in the case of private corporations, that the act is ineffectual until it is accepted by the corporators, governs also in the case of public corporations, like towns.' 'But there is no such rule in the case of public corporations of a municipal character. The acts of incorporation are imperative upon all who come within their scope. Nothing depends upon consent, unless the act is expressly made conditional . . . . by the mere passage of the law the town is completely constituted,

entitled to the rights and subject to the duties and burdens of a town, whether the inhabitants are pleased or displeased . . . . they (the towns) are absolutely created by the act of incorporation, without the acceptance of the people, or any act on their part, unless otherwise provided by the act itself.'

" The relator contends that, because the third section of the act of 1889 provides, 'and the charter of the borough shall continue in full force and operation, and all officers under the same shall hold their respective offices until the first Monday of April following' etc., the borough and its charter was not superseded by that of the city. The same sentence in this section gives answer, that persons in office when letters-patent are issued to the city shall hold over until the first Monday in April, 'at which time the officers of said city chosen at the preceding municipal election shall enter upon their respective terms of service and the city government shall be duly organized under this act.' It is evident that this part of the third section is intended to make the transition from borough to city government with as little friction as possible.

" 'The transition from the one class to the other works no change in its government except such as the law makes necessary to adjust it to the class into which it goes. It repeals no ordinances; it vacates no offices except these which it abolishes, and makes no vacancies to be filled except by the creation of new offices : ' PAXSON, C. J., in Com. v. Wyman, 137 Pa. 520.

" It is said by STRONG, J., in The Trustees of the Erie Academy v. The City of Erie, 31 Pa. page 516, ' There is no doctrine better settled than that a change in the form of government of a community does not ipso facto abrogate pre-existing law, either written or unwritten. . . . The act of assembly converting the borough into a city did not, therefore, of itself, and in the absence of express provisions to that effect, either repeal former acts of assembly relative to the borough, or annul existing ordinances. It was solely a change of the organic law for the future, and left unaffected the borough statutes, precisely as a change of a state constitution leaves undisturbed all prior acts of assembly.'

" In the argument of counsel for the relator it was claimed that the borough of Hazleton had a vested right to a share of

the license money to be paid by the relator.  Even were the proposition sound the relator could not in this proceeding raise the question.  The license money is not in the borough treasury.  But it is an unsound, perhaps an absurd argument, that political power conferred by the legislature can be a vested right as against the commonwealth in any individual or body of men.  If boroughs can set up a vested right as against the commonwealth to the exercise of this species of power, because it has been conferred upon them by the bounty of the legislature, so may every officer under the government do the same : The People v. Morris, 13 Wend. 325.

"In our opinion the provision in the act of 1889, that the borough charter, etc., shall remain in full force until the first Monday of April following the issuing of letters-patent, has nothing whatever to do with the question at issue in this case.  It is intended solely to prevent confusion in the process of superseding the borough government by that of the new city.

" While rights of property, and actions at law and the enforcement of contracts are provided for in this act, and the municipal officers are continued in office, not a word is said on the subject of licenses.  If the legislature had intended that the general license law of the state was not to take effect in the territory now become a city by virtue of the charter, until the city government had been fully organized, they would have made the intention plain by using language suitable for the purpose.

"It is the duty of the court to construe this legislation in a broad and comprehensive, rather than in a narrower and purely technical, manner.  And this duty is made more emphatic by the consideration that the licensed dealers in liquors in Hazleton, in justice and equity, should pay for their licenses as much as do those engaged in the business in the other cities of the commonwealth.  The fact that only four days will intervene between the date when the licenses granted will go into effect and the complete organization of the city government, ought not to affect our conclusion in this case.

" Judgment upon the case stated is directed to be entered in favor of the defendant."

RICE, P. J., dissented, in the following opinion :

" On Feb. 29, 1892, the relator's petition to sell liquor by

retail in the borough of Hazleton was granted.   By the stand-
ing orders of the court all licenses begin on April 1.   The
question is, whether the relator is required to pay $500, or only
$150, for the privilege.

" The act of May 13, 1887, as amended by the act of June 9,
1891, P. L. 248, declares that persons licensed to sell by retail,
resident in cities of the third class, shall pay the sum of $500,
and those resident in boroughs, the sum of $150 for this priv-
ilege.   In cities the sum of $100, and in boroughs one fifth the
amount of the license is to be paid for the use of the county,
and the residue for the uses of the respective boroughs and
cities.

" The case before us directly involves the determination of
the amount to be paid by the relator, and, incidentally, the
method of its distribution.

" In considering the question whether the relator is required
to pay according to the higher or lower rate, it is difficult not
to be influenced by the fact that, within the brief period of
four days after his license will go into effect, Hazleton will
become a fully organized city of the third class, and, therefore,
if his demand is sustained, he will be permitted to sell liquor
therein for substantially a whole year upon payment of $150,
whereas persons licensed to sell in the same way in other cities
of the same class will be required to pay $500 for the same
privilege.   But, upon reflection, it will be seen that the length
of time between the beginning of the license term and the or-
ganization of the city government ought to have no influence
in the construction of the act of May 23, 1889, P. L. 277, relat-
ing to the incorporation of cities of the third class, on which
the case turns.   In this instance, the intervening period hap-
pens to be very brief, but if, under the rule of court, the license
were to begin on Jan. 1, for example, three months would in-
tervene, during which period there would be nothing to dis-
tinguish this municipality from other boroughs of the state, and
no apparent reason why retailers of liquor should pay a higher
rate for the privilege than is paid by dealers in other boroughs.
The same would be true for the whole of the license term if,
perchance, the governor had not issued the letters-patent un-
til it was too late to elect city officers for the ensuing year.
If any argument is to be drawn from the effects and conse-

quences of different constructions of the law, I think it is quite as favorable to the view taken by the relator as that taken by the respondent; but I think the consideration referred to has no legitimate bearing on the question, the true solution of which must depend on the status of the municipality on the date when the relator's license will go into effect, namely, on April 1. Will it be a borough or a city of the third class? If the former, he is required to pay $150; if the latter, $500. There is no authority for apportioning the license, and saying that he shall pay at the former rate for the period that it will remain a borough, and at the latter rate for the period that it will be a city.

" Hazleton was incorporated under the general borough law, and, according to the last decennial census, contained a population of 10,000 and over. In November last an election was held therein upon the question of becoming a city. It appearing by the returns that there was a majority in favor of a city charter, the governor, on Dec. 10, 1891, issued letters patent, reciting the facts, defining the boundaries of the city, and constituting the same a body corporate and politic by the name of the city of Hazleton, as provided in § 2 art. I. of the act of May 23, 1889. The first clause of the succeeding section reads as follows: 'All the property and estates whatsoever, real and personal, of the towns or boroughs which shall have thus become a city of the third class, are hereby severally and respectively vested in the corporation or body politic of said city, by the name, style and title given thereto as aforesaid, and for the use and benefit of the citizens thereof forever.' Great stress is laid on this language, and I concede that, if it stood alone, it would bear but one construction, namely, that the corporate existence of the city began, and the rights and property of the former borough became vested therein, immediately upon the issuing of the letters-patent. But while conditions precedent do not delay the existence of a corporation unless such seems to be the legislative intent, yet if on a fair view of the act as a whole such legislative intent is clear, it ought to control, notwithstanding the language of the letters-patent is in the present tense. I think such intent appears in the provision immediately following that above quoted. It reads as follows: 'And the charters of the said towns or boroughs shall continue in full

force and operation, and all officers under the same shall hold their respective offices until the first Monday of April following the third Tuesday of February next succeeding the issuing of letters patent to the said city, at which time the officers of the said city, chosen at the preceding municipal election, shall enter upon their respective terms of service, and the city government shall be duly organized under this act.' 'There cannot be two municipal corporations for the same purposes, with co-extensive powers of government, at the same time over the same territory; but this means two legal and effective corporations, and does not apply when there is a de facto corporation without right, and a corporation legally organized, but not in actual government till the former is ousted. The functions of the legal corporation are in abeyance until the ouster, and then come into full activity:' 15 Am. & Eng. Encyclopedia of Law, 1007. How else can you determine the character of a corporation comprised of certain territory, and the people resident therein, than by the charter under which it is operating? This is not the case of a de facto corporation, usurping the functions of a de jure corporation. The legislature has not left it in doubt as to which has rightful jurisdiction. Having plainly declared that the borough charter and the borough government shall remain in full force and operation until the city government shall be organized, it seems impossible to avoid the conclusion that the legislature intended that the city corporation should not take the place of the borough corporation until that time. In the meantime the corporation will have none of the powers of a city, and the citizens resident within its boundaries will have none of the benefits of a city government, and none of its privileges, except that of electing the officers to control its affairs when it shall come into active life. The city, as such, can neither contract, nor acquire property, nor make ordinances, nor levy and collect taxes, nor sue or be sued. All the powers which the corporation has are those which are preserved to it by the borough charter; it can exercise no other. The borough will continue to have power to deal with the property of the corporation in the same way as before, and all property acquired in the meantime will be acquired in its name; until merged in the city, the borough will continue to exist, not merely as a de facto, but as a de jure corporation, the only municipal corpo-

ration which has life or right within the territory of which the relator is a resident.

" This conclusion is strengthened by an examination of the next provision of the same section, which serves to explain when and how the city will be vested with and succeed to the rights of the borough.    It reads as follows : ' All suits, prosecutions, debts and claims whatsoever shall thereupon become transferred to the said city, which, in all suits pending, shall be substituted as party therein and be under the management and control thereof, as fully and completely as if no alteration had been made in the said charter.'    The immediate context shows that the time referred to here is the date of the organization of the city government, and not the date of the letters patent.    The transfer spoken of is not a formal assignment, but a transfer by operation of law.    This necessarily implies that, until the city government is organized, no right to any debt or claim arising in the meantime can accrue to the city as such, but that all such debts and claims will accrue to the borough in its own right, and by virtue of its chartered powers to demand and receive them.    If collected in the meantime, the borough will collect and receive them in its own right and name, and, if not collected, the right to collect and receive them will pass by operation of law to the city, but its right will be measured by that of the borough of which it will be the successor.    For example, the right to demand from the county treasurer its proportion of the license money will accrue to the municipality before the city government will be organized.    In what capacity shall it make this demand, as a borough, as a city, or as a borough to the use of a city that is to be organized ?    Clearly, as a borough, in fact as well as in name, and for its own use ; and, as the law declares that the proportion payable to a borough is different from that payable to a city, it would seem clear that the proportion payable to the municipality in this instance will depend on the grade and character of the corporation in existence and operation at the time the right to make the demand will accrue.

" Again, the act goes on to provide that, ' all claims and demands . . . payable presently or in future, existing against the said towns or boroughs when the said charter shall go into operation, shall, by force thereof, be recoverable from or against the

said city.' If the act is to be construed as contended for by the respondent, the charter went into operation immediately upon the issuing of the letters patent. But this cannot be what the legislature meant; (1) because the city charter cannot be in operation over the territory described, at the same time that the borough charter is in full force and operation; (2) because the construction will leave claims and demands accruing between the date of the letters patent and the organization of the city government, wholly unprovided for. It may be said that express provision was not necessary. Possibly so, but the legislature saw fit to make one, and it is to be presumed that they intended it to be adequate to impose liability on the city for all debts and demands against the municipality that might accrue before the organization of the city government. In my opinion the words, ' when the said charter shall go into operation,' as applied to liability for debts of the corporation, have reference to the same time indicated in the preceding clause, declaring when the rights, debts and demands accruing to it shall become transferred to the city. If the legislature had said in so many words, ' the city charter shall go into operation on the organization of the city government, on the first Monday of April following the election of officers, and in the meantime the borough charter shall remain in full force and operation,' there would be no doubt as to the corporate character of the municipality at this time. It would be a borough, and subject to all laws relating to boroughs incorporated under the general law. While the legislature has not used this precise form of expression, I am of opinion that its intent that the operative effect of the city charter should remain in abeyance, and that of the borough charter should remain in full force, can be as clearly discerned from a fair view of the whole act, as if it had.

" It is claimed that, although, for all purposes of municipal government and jurisdiction, Hazleton is still a borough, yet it is a city within the meaning of the act regulating the license fees to be paid in the several classes of municipalities into which the state is subdivided. I concede that if there is any way in which such legislative intent can be discovered, it ought to control. But, if this construction is to prevail, was it not, to say the least, irregular to grant the application of the relator to sell liquor by retail ' in the borough of Hazleton.' I would

not press this point as fatal to the application, or the order of granting the license, but merely suggest it as indicative that the court in acting on the application deemed Hazleton, in name, at least, a borough; and, as I view the law, it could not properly have been described otherwise. The granting of letters-patent did not change the territory comprised in the municipality, nor make the privilege of selling liquor therein any more valuable than it was before, nor add a dollar to the expense of maintaining the government thereof between that time and the organization of the city government, nor increase its population. In all these particulars it remained the same as before, but when the city government is organized there will be a change, not in territory nor in population, it is true, but in the cost of maintaining the government, and in the efficiency thereof, and therefore a substantial reason for requiring a higher rate to be paid. But so long as it remains a borough no such reason can be assigned for supposing that the legislature intended a higher rate to be paid than in other boroughs. Liquor dealers are classified, not according to the amount of sales, nor according to the population, but according to the municipal character of the several divisions of the state. Probably, taking all things into consideration, no better standard could be found. But we are not called upon to defend the wisdom and equality of the classification, but to determine the class to which the relator belongs. The only guide we have to determine the intent of the legislature is its plain language, that those dealers, resident in one kind of municipality, shall pay one rate, and those resident in another kind shall pay another. Conceding that the borough charter, which is to remain in full force and operation, includes only those laws which relate to municipal government, jurisdiction and affairs, and that the liquor license law is not such a law, still the character of the charter, for the time being in force, determines whether this municipality is a borough or a city. I see no escape from this conclusion, and, if it be correct, then a law relating to cities, or to the rights, duties and privileges of persons resident in cities, will not become operative therein until it becomes a city.

" My conclusions, briefly summarized, are as follows:

" 1. The question, whether a retail liquor dealer in Hazleton is required to pay a license fee of $500, or only $150, is to be

determined by the status of that municipal corporation on April 1st, when the license will go into effect.

"2. The legislature, having plainly declared that the borough charter shall remain in full force and operation until the first Monday of April following the election of city officers, and that the city government shall not be organized until that time, has, by necessary implication, declared that the city charter shall remain in abeyance until that time.

"3. The test by which to determine the applicability of a law relating to the affairs of a particular kind of municipal corporation, or to the rights, duties and privileges of persons resident therein, is the charter under which, for the time being, the corporation is operating.

"4. In this case Hazleton is still a borough by name, and subject exclusively to a borough charter; the relator is therefore a resident of a borough, and is subject to a law declaring that liquor dealers resident in boroughs shall pay for the privilege the sum of $150."

*Error assigned* was the opinion and judgment of the court.

*G. L. Halsey*, *C. W. Kline* with him, for appellant.

*J. B. Woodward* and *John McGahren*, for appellee.—The provision in § 3 art. I. of the act of 1889, that the charters of boroughs shall continue in full force and operation and all officers under the same shall hold their respective offices, until the first Monday of April, is the usual and ordinary one found in all acts providing for the incorporation of cities in this state, whether the same be general or special acts: City of Reading, § 33 of act of March 16, 1847, P. L. 418; City of Harrisburg, § 52 of act of March 19, 1860, P. L. 199; City of Wilkes-Barre, act of March 4, 1871, P. L. 539. And yet in all decisions bearing on the construction of said acts and defining the rights, powers and duties of said municipalities, their charters are treated as going into effect and operation on the date of the same: Com. v. Reynolds, 137 Pa. 390.

OPINION BY MR. CHIEF JUSTICE PAXSON, April 25, 1892:

We reverse this case for the reasons given by the learned president of the court below in his dissenting opinion.

The judgment is reversed, and it is ordered that judgment be entered in favor of the relator.